CARLSMITH BALL LLP

DAVID LEDGER
ELYZE J. MCDONALD
Bank of Hawaii Bldg., Suite 401
134 West Soledad Avenue, P.O. Box BF
Hagåtña, Guam 96932-5027
Tel No. 671.472.6813

Attorneys for Plaintiff
Jan's Helicopter Service, Inc.

**FILED**
DISTRICT COURT OF GUAM
APR 17 2007
**MARY L.M. MORAN**
**CLERK OF COURT**

IN THE DISTRICT COURT OF GUAM

| | |
|---|---|
| JAN'S HELICOPTER SERVICE, INC., | CIVIL CASE NO. CIV03-00002 |
| Plaintiff, | **PLAINTIFF'S MEMORANDUM IN OPPOSITION TO DEFENDANT'S AMENDED MOTION TO DISMISS FOR FAILURE TO STATE A CLAIM OR, IN THE ALTERNATIVE, TO TRANSFER; DECLARATION OF DAVID LEDGER; EXHIBITS A-J: DECLARATION OF SERVICE** |
| vs. | |
| FEDERAL AVIATION ADMINISTRATION, | |
| Defendant. | |

## I. INTRODUCTION

In its amended motion to dismiss for failure to state a claim, or in the alternative, to transfer, Defendant Federal Aviation Administration ("FAA") fails to provide any grounds upon which a transfer or a dismissal would be appropriate. A transfer of this case to the Court of Federal Claims would be improper because the FAA contests liability for the due process violations alleged against it and contests that the actions of the FAA agent Lewis Zeigler were authorized specifically by a money-mandating constitutional provision, statute, or regulation. As jurisdiction in the Federal Court of Claims would only be proper under reversed circumstances, that is, the FAA not contesting liability or Zeigler's authority to take the actions he did, a transfer

**ORIGINAL**

here would be inappropriate. Second, dismissal of this case is improper because the Complaint and the record demonstrate overwhelmingly sufficient facts to support a cognizable claim, specifically, that the FAA, by way of Mr. Zeigler's authorized and ratified actions, violated Plaintiff Jan's Helicopter Service, Inc.'s ("Jan's") rights to due process of law.

For these reasons and those stated herein, the FAA's amended motion should be dismissed.

## II.   **FACTUAL DISCUSSION**

### A.   THE FAA THROUGH THE ACTIONS OF LEWIS ZEIGLER GROUNDS JAN'S AIRCRAFT.

Jan's is the legal and registered owner of deHavilland Caribou DCH-4A, call sign RPC2702. First Am. Compl. ("Compl."), ¶ 5. The Caribou had legally operated under 14 C.F.R. § 375.30 since March 7, 2000. Compl., ¶ 6. Specifically, the Department of Transportation informed Jan's that "[w]ith the company owning, operating, and crewing the Caribou itself, operations would be authorized by regulation under section 375.30, and no additional DOT operating authority would be required." Compl., ¶ 6.

On July 31, 2002, Lewis I. Zeigler, an FAA San Francisco-based employee with oversight of aircraft operating in Guam, sent an e-mail message to the Guam International Airport. In particular, Zeigler stated that he had heard about a Caribou aircraft operating in the region to transport helicopters and that the Caribou did not have authority to operate. Compl., ¶ 10, Ex. A attached thereto. As a result of Zeigler's email Guam International Airport authorities on August 9, 2002 grounded the aircraft by denying it access to the GIAA taxiway for a legal non-cargo maintenance - check flight.[1] Compl., ¶ 10.

---

[1] Zeigler's message to GIAA revoking the aircraft's operating authority came to light in the most unfortunate of circumstances. On August 9, 2002, Jan's intended to fly the aircraft on what was basically a routine maintenance flight to check operational status. When the pilot requested runway clearance from GIAA it was denied without explanation. When the pilot returned to the hangar he telephoned GIAA authorities and asked on what authority

The FAA did not provide Jan's with any prior notice of the revoking of its operating authority and grounding. Compl., ¶ 11. A comparison of the July 31, 2002 date of Mr. Zeigler's email and the August 9, 2002 grounding demonstrates that both the FAA and the GIAA authorities kept Zeigler's revocation of operating authority secret from Jan's until the Caribou had been readied for flight with gas and crew on board and was on the airport ramp requesting clearance to taxi to the runway. Compl., ¶ 11.

Subsequent conduct by the FAA during attempted administrative review process confirmed and ratified Mr. Zeigler's authority to act in the manner he did. On August 23, 2002, the FAA through its Regional Counsel Monroe Balton issued a "preliminary finding" upholding Mr. Zeigler's "*conclusion* that the Caribou was not authorized to operate from Guam." Ex. A at p. 3 (emphasis added). In particular Mr. Balton's "preliminary finding" alleged that the Caribou did not have operating authority under 14 C.F.R. Part 375 because it is "used to transport helicopters to other islands in the Western part of the Pacific Ocean where the helicopters, for compensation, are used to spot fish in support of commercial fishing operations." Ex. A. Instead, the FAA stated that because it was "a commercial air operation using a foreign registered civil aircraft, a permit is required" pursuant to 14 C.F.R. § 175.40. Ex. A. The FAA through Balton also states that "it appears that Mr. Zeigler's conclusion was accurate." Ex. A.

Second, on September 13, 2002, the Guam International Airport Authority likewise endorsed and ratified the FAA's decision on the Caribou. In particular, the GIAA advised Jan's that Mr. Balton's letter "makes clear that the Philippine registered Caribou aircraft under RPC 2702 is not authorized for use in the conduct of commercial activity or operations on Guam . . .," and that Jan's Caribou could not be used for commercial air activity at or out of the Airport. Ex.

___

they had grounded the aircraft as GIAA authorities are not FAA employees with authority to ground aircraft. In response, GIAA authorities faxed Jan's a copy of Zeigler's email message.

B.

Third, in response to Jan's request for a hearing, *see* Ex. C, on September 19, 2002, Mr. Balton declined the request on grounds that Mr. Zeigler's email was not a "final order" within the meaning of 49 U.S.C. 46110, however, if Jan's nonetheless considered filing a formal complaint under FAR 13.5, that section did not apply to "complaints against FAA employees *acting within the scope of their employment*." Ex. D (emphasis added). In other words, Mr. Balton gave a pre-emptive warning that any effort by Jan's to sue Zeigler personally would fail because when he sent his email to GIAA he had acted within the scope of his employment as an official of the FAA. It is interesting if not almost amusing to compare this statement by FAA's own legal counsel with the FAA's current contention that Zeigler acted on his own outside his scope of employment.

Jan's proceeded to file administrative complaints on September 23, 2002. *See* Ex. E. Jan's counsel David Ledger also started communicating with Washington, D.C.-based FAA Manager of Enforcement Division Allan Horowitz about the FAA's lack of response to the Administrative Complaint. Exs. F, G. In response to Mr. Ledger, Mr. Horowitz confirmed that Mr. Zeigler had acted within the scope of his employment and that the FAA had responded to the September 23 complaint letter, but provided no other elaboration. Ex. F-1.

Jan's received yet another communication from Ed Averman of the FAA, who stated that "Mr. Zeigler's E-mail message did not order it or its officials to do anything." Ex. H. Jan's asked again for a response to its administrative complaint, *see* Ex. I, but again received no response.

B.   THE FAA DENIES JAN'S ANY JUDICIAL RELIEF IN THE DISTRICT COURT OF GUAM

As a result of the events described above and the FAA's refusal to convene administrative hearings, on February 18, 2003, Jan's filed a Complaint with the District Court of Guam. On

May 30, 2003, the FAA filed a motion to dismiss on the grounds that Mr. Zeigler's email was a "final order" under 49 U.S.C. § 46110, depriving the District Court of Guam of jurisdiction over the Complaints and instead vesting jurisdiction in the Ninth Circuit Court of Appeals.[2] The Court heard the motion on August 1, 2003. During the hearing, the FAA's legal counsel confirmed that Mr. Zeigler's opinion "was probably the correct opinion, because [Jan's] was a commercial operation and required authority from the Department of Transportation, and it wasn't fair, and therefore, Jan's Helicopters could not operate legally under those circumstances." Ex. J at 6:22 – 7:3. FAA counsel also confirmed that Jan's had no choice but to adhere to Mr. Zeigler's revocation of authority to operate.

> THE COURT: Well, let me ask you something here, Mr. Caplan. Let's suppose that this outfit had chosen to violate Balton's letter[3] and whatever other direction that they were given that's not a final order by the FAA, okay, let's suppose that they said, well, forget this, we'll still land anyway; what would happen to them?

> MR. CAPLAN: If they chose to violate?

> THE COURT: Yes.

> MR. CAPLAN: Then they would act at their peril, certainly, because the government, the FAA could certainly take appropriate action to seek either compliance through perhaps a cease and desist order, or perhaps seek an enforcement action to take punitive actions through either certificate action or civil penalty. They would act at their peril certainly.

> . . .

> MR. CAPLAN: We believe that in this case and under any statute or federal regulations, the persons that are

---

[2] The Court should note that just months earlier when it suited their purpose FAA Enforcement Manager Allan Horowitz had stated that Zeigler's email was not an order. Ex. F-1.

[3] Even though in this exchange with FAA counsel the District Judge referred specifically to the Balton letter, the motion to dismiss filed in the related case, *Americopters, LLC v. Federal Aviation Administration*, District Court of Guam Civil Case No. 03-00005, and the Jan's motion had been combined for joint hearing thus the Court's discussion with FAA counsel concerning the need to comply with FAA directives applied equally to the Balton letter and the Zeigler e-mail.

subjected to it have an obligation to obey those regulations, those statutes, and act at their peril when they fail to do so.

Ex. J at 7:17 – 8:7, 8:23 – 9:2 (footnote added). The FAA's counsel further stated that "the plaintiffs have been placed on notice by the federal government that if they engage in this action, it may, the opinion of at least knowledgeable officials, be inconsistent with the regulations and the statute, and that they act at their peril" and "run the risk of being prosecuted, perhaps, of having a cease and desist order taken against them." Ex. J at 10:22 – 11:2, 11:5-7.

The District Court granted the Motion to Dismiss at the hearing on grounds that Zeigler's email constituted an FAA final order under 49 U.S.C. 46110 thus vesting exclusive jurisdiction with the Ninth Circuit. Jan's appealed the District Court's decision. The Ninth Circuit affirmed in part, reversed in part, and remanded Jan's' due process claims, holding that "the district court has jurisdiction to consider constitutional claims for damages." *Americopters, LLC v. Fed. Aviation Admin.*, 441 F.3d 726, 738 (9th Cir. 2006).

On February 22, 2007, Jan's filed its First Amended Complaint, which alleged one count: violation of due process. The FAA's Answer **denies** that it violated Jan's rights to due process. *See* Answer filed March 13, 2007, ¶ 18 (FAA denies that it violated Jan's due process rights).

On March 13, 2007, the FAA filed an Amended Motion to Dismiss for Failure to State a Claim or, In the Alternative, to Transfer.[4]

---

[4] In *Americopters*, Americopters noticed a deposition in order to discover facts related to the FAA's dismissal motion. The FAA then filed a Motion to Suppress Deposition on the grounds that when a motion to transfer an action to the Court of Federal Claims, depositions and all such proceedings are stayed until after the District Court rules on the motion to transfer. Americopters' opposition to the motion contended that if the Court did not allow the taking of the deposition, that it should stay the hearing on the motion to dismiss until the deposition could be taken. *See* Pl.'s Opp. to Def.'s Mot. To Suppress Deposition of Donald Hamilton, filed Apr. 3, 2007. The Magistrate issued a recommendation that should the Court deny the motion to transfer, that the deposition of Don Hamilton be allowed to proceed before the District Judge reaches the merits of the motion to dismiss.

## III. **LEGAL DISCUSSION**

A.   THE COURT SHOULD CONSIDER THE MOTION TO TRANSFER BEFORE
     CONSIDERING THE MOTION TO DISMISS.

Under 28 U.S.C. § 1292, *all* actions must be held in conveyance once a motion to transfer

has been filed. Jan's therefore requests that the Court first determine the issue of transfer prior to

considering the merits of the FAA's motion to dismiss.

B.   THE FEDERAL COURT OF CLAIMS HAS RULED IN CASES SIMILAR TO
     THIS ONE THAT IT LACKS JURISDICTION OVER DUE PROCESS
     CLAIMS WHERE THE LIABILITY OF THE GOVERNMENT TO PAY
     COMPENSATION IS IN ISSUE

The Court of Federal Claims only has jurisdiction to hear claims in excess of $10,000 and

founded either upon the Constitution, or any Act of Congress, or any regulation of an

executive department, or upon any express or implied contract with the United States. 28 U.S.C.

§ 1491. The Little Tucker Act grants jurisdiction, concurrent with the United States Court of

Federal Claims, to federal district courts for the same types of claims allowed by the Tucker Act

that do not exceed $10,000. 28 U.S.C. § 1346(a)(2).

However, under the Tucker Act and the Little Tucker Act a plaintiff's right to

compensation must stem from a substantive right in some other source of law, such as "the

Constitution, or any Act of Congress, or any regulation of an executive department," 28 U.S.C. §

1346(a)(2), that "can be fairly interpreted as *mandating* compensation by the Federal

Government for the damage sustained," *Mitchell II,* 463 U.S. 206, 217 (1983) (emphasis added).

In other words, the transfer rule applies in cases where the only controversy is the amount of

compensation to be paid, as opposed to whether or not the Government is liable to pay any

compensation.

The Federal Court of Claims does not have jurisdiction over claims asserting violations

of due process under the Fifth Amendment, which does *not* mandate compensation by itself.

*Crocker v. United States*, 125 F.3d 1475, 1476 (Fed. Cir. 1997). In *Crocker* the Mississippi Sheriff's Department seized currency and savings bonds during a search of the plaintiff's residence, and turned over the currency and bonds to the Drug Enforcement Agency ("DEA"). *Id.* at 1475. DEA then published notices of intended forfeiture, and notified the plaintiff of her right to file a claim. *Id.* at 1475-76. The plaintiff filed a claim, but the DEA alleged that her claim was submitted after the deadline. *Id.* at 1476. It therefore forfeited her bonds. *Id.*

The plaintiff then filed suit in the Court of Federal Claims claiming just compensation for the wrongful seizure and forfeiture without due process and just compensation. *Id.* The Court ruled that it could not adjudicate her due process claims, and that in order for her to establish jurisdiction within the Court of Federal Claims, "she would have had to concede the lawfulness of the seizure and the forfeiture." *Id.* However, the gravaman of her complaint was the unlawfulness of the seizure and her due process rights, which, the Court held, belonged in the district courts of the United States, and not in the Court of Federal Claims. *Id.* *See also* *Achenbach v. U.S.*, 56 Fed. Cl. 776, 776 n.1 (Fed. Cl. 2003) (court may only entertain actions based on some substantive provision of law, regulation, or the Constitution which fairly can be construed as mandating compensation; due process clause of the Fifth Amendment is not money-mandating, and thus Court of Federal Claims does not have jurisdiction to hear these claims).

The FAA's cases do not dispute this point. *Regional Rail Reorganization Act Cases*, 419 U.S. 102, 126-27 n.16 (1074) states: "The taking of private property by an officer of the United States for public use, without being authorized, expressly or by necessary implication, to do so by some act of Congress, is not the act of the government,' and hence recovery is not available in the Court of Claims." The FAA and *Regional Rail Reorganization Act Cases* also cite *Hooe v. United States*, 218 U.S. 322, 335 (1910), which states that "[i]t cannot be said that any claim for a specific amount of money against the United States is founded on the Constitution, unless such

claim be either expressly or by necessary implication authorized by some valid enactment of Congress."

Here, Jan's claim against the FAA is based solely on the due process clause of the Fifth Amendment. *See* Compl. The claim relates to violations of due process, namely, the Federal Aviation Administration's failure to afford Jan's any due process before and after its employee Lewis Zeigler admittedly acting within the scope of his employment revoked aircraft operating authority resulting in the grounding of the aircraft without prior notice or an opportunity to be heard. The allegations concerning the FAA's violations of Jan's due process rights are adequately stated in the First Amended Complaint. However, this type of claim based on the Fifth Amendment, which ***does not specifically mandate compensation***, does not confer jurisdiction in the Court of Federal Claims, as established in *Crocker*.

Indeed, the FAA has expressly contested liability for the due process violations. *See* Answer filed Mar. 13, 2007.[5] Moreover, Jan's hardly concedes the lawfulness of the FAA's actions. *Crocker*, 125 F.3d at 1476. Should the FAA concede liability as a result of Mr. Zeigler's authorized and ratified actions, leaving in controversy only ***the amount*** of compensation due, only then would this case be within Federal Court of Claims exclusive jurisdiction. Absent either party's concession, this disputed issue of whether or not a violation of due process occurred puts this issue squarely before this Court, and clearly precludes any exercise of jurisdiction by the Federal Court of Claims.

The FAA blithely yet understandably characterizes Jan's claim as solely a "takings claim", and also understandably ignores Jan's assertion that the FAA violated its due process rights. The FAA asserts that because it was an "unauthorized takings", there can be no

---

[5] The FAA claims that the Ninth Circuit agreed that the actions of Mr. Zeigler were unauthorized. The Ninth Circuit made no such finding. *See* 441 F.3d 726. The discussion on "authority" is clearly limited to the authority of a select few FAA officers to issue" final orders" within the meaning of 49 U.S.C. 46110. Jan's due process claim has nothing to do with an FAA "final order" but rather the authorized actions taken by Zeigler.

jurisdiction in this District Court. While Jan's does seek damages in the form of just compensation, the **unlawfulness** of the FAA's conduct – the stopping of authorized flights without due process - is at issue, not just the issue of what amount of just compensation is due. *See Florida Rock Indus., Inc. v. United States*, 791 F.2d 893, 898-99 (Fed. Cir. 1986) (Tucker Act does not create jurisdiction in the Court of Federal Claims for a party contesting the propriety of a taking). In this respect, should this case be transferred, the Court of Federal Claims will have no jurisdiction to hear this dispute. Jan's expects that if this case is transferred, the FAA will then move to dismiss on the grounds that it contests liability and that such contest means that the case is not proper before the Federal Court of Claims.[6]

C.    SHOULD THE COURT ENTERTAIN THE MOTION TO DISMISS, THIS CASE IS NOT SUBJECT TO DISMISSAL AND THE MOTION MUST BE DENIED.

If the Court proceeds to consider the motion to dismiss, the only issue is whether Jan's has sufficiently stated a claim for relief under the Due Process Clause of the Fifth Amendment. Under the Fifth Amendment, due process requires the government to provide notice reasonably calculated to apprise interested parties of the pendency of an action and an opportunity to present their objections. *Mullane v. Cent. Hanover Bank & Trust Co.*, 339 U.S. 306, 314 (1950).

The court must decide whether the facts alleged, if true, would entitle plaintiff to some form of legal remedy. Unless the answer is unequivocally "no," the motion must be denied. *Conley v. Gibson*, 355 U.S. 41, 45–46 (1957); *De La Cruz v. Tormey*, 582 F.2d 45, 48 (9th Cir. 1978). Thus, a Rule 12(b)(6) dismissal is proper only where there is *either* a "lack of a

---

[6] Though Jan's does not profess to have a crystal ball to predict the FAA's next move, it does have the benefit of hindsight. As noted above, initially FAA official Allan Horowitz denied that Zeigler's email was a final order. But then in front of this Court to win a dismissal, the FAA claimed that since Zeigler had issued a "final order" jurisdiction was vested exclusively at the Ninth Circuit. Once at the Ninth Circuit, however, the story changed. Again to win a dismissal the FAA (successfully) argued that the Ninth Circuit lacked jurisdiction because no "final order" had ever been issued. Now we are asked to believe that if transferred to a court clearly lacking jurisdiction, the FAA will not again seek dismissal on lack of jurisdiction.

cognizable legal theory" *or* "the absence of sufficient facts alleged under a cognizable legal theory." *Balistreri v. Pacifica Police Dept.,* 901 F.2d 696, 699 (9th Cir. 1990); *Graehling v. Village of Lombard, Ill.,* 58 F.3d 295, 297 (7th Cir. 1995) ("A suit should not be dismissed if it is possible to hypothesize facts, consistent with the complaint, that would make out a claim").

In resolving a Rule 12(b)(6) motion, the court must (1) construe the complaint in the light most favorable to the plaintiff; (2) accept all well-pleaded factual allegations as true; and (3) determine whether plaintiff can prove any set of facts to support a claim that would merit relief *Cahill v. Liberty Mut. Ins. Co.,* 80 F.3d 336, 337–38 (9th Cir. 1996). "The issue is not whether a plaintiff will ultimately prevail but whether the claimant is entitled to offer evidence to support the claims." *Hydrick v. Hunter*, 466 F.3d 676, 686 (9th Cir. 2006). "A complaint should not be dismissed for failure to state a claim unless it appears beyond doubt that the plaintiff can prove no set of facts in support of his claim which would entitle him to relief." *Conley v. Gibson,* 355 U.S. 41, 45–46 (1957).

The Complaint sufficiently alleges that the actions of Mr. Zeigler were authorized, and that the FAA did not provide notice reasonably calculated to apprise Jan's that it could not operate the Caribou from Guam International Airport. The allegations of the Complaint are also substantially supported by the record which clearly shows that Mr. Zeigler had the authority to act on behalf of the FAA in this particular instance, and that the FAA Enforcement Division through Allan Horowitz ratified his conduct. Ex. F-1.

The Complaint alleges that Mr. Zeigler was an agent of the FAA, and that his revocation of operating authority and directive to the GIAA was followed, as Jan's was unable to operate the Caribou. Compl., ¶¶ 9, 10; Ex. B. Such was a violation of due process because prior to revoking the Caribou's operating authority which directly caused the grounding of the aircraft, Mr. Zeigler and the FAA failed to give Jan's any notice reasonably calculated to apprise them of the potential

revocation of authority and grounding action. Jan's due process rights were further violated after it was given absolutely no opportunity to be heard about the deprivation of its property. *See* Ex. A - I. Over and over again, Jan's was given the run-around that Mr. Zeigler's email was not a final order, and yet, the FAA expected compliance even while arguing to this Court for dismissal on grounds that the Zeigler email was indeed a final order.

The expectation of compliance was confirmed by the FAA's counsel during the first motion to dismiss filed in this case and heard by this Court. Specifically, the FAA's counsel Kenneth Kaplan stated on the record that Jan's had no choice but to comply with Mr. Zeigler's order, or act at its peril and run the risk of being prosecuted.

Moreover, Mr. Zeigler's conduct was authorized and/or ratified. FAA Regional Counsel Monroe Balton characterizes Mr. Zeigler's actions and conclusions as "accurate." Ex. A. He also later issues a pre-emptive warning to Jan's that a complaint against Zeigler under FAR 13.5 would not be proper because FAR 13.5 complaints do not apply to FAA employees acting within the scope of their employment. Ex. D. During the first motion to dismiss in this case, the FAA's counsel Kaplan stated on the record that Mr. Zeigler's opinion "was probably the correct opinion." Ex. J at 6:22 – 7:3.

Therefore, the Complaint and the record clearly show that there was both a violation of due process through a lack of notice provided to Jan's about the revocation of authority and grounding of the Caribou, and that Mr. Zeigler's actions were authorized and later ratified as correct. As sufficient facts have been pled to support a claim for a violation of due process, dismissal of this case is therefore not proper.

## IV.   **CONCLUSION**

Jurisdiction over this case does not lie with the Federal Court of Claims because Jan's asserts a violation of due process against the FAA which the FAA disputes. The Federal Court

of Claims can only adjudicate cases in which the right to just compensation is not at issue and where a constitutional provision, statute, or regulation mandates the compensation of money.

Moreover, should this Court entertain the FAA's motion to dismiss, dismissal is not proper because Jan's has sufficiently alleged, and the record amply supports, that the FAA has violated Jan's rights to due process.

For these reasons, the Court should deny the FAA's motion in its entirety.

DATED: Hagåtña, Guam, April 17, 2007.

CARLSMITH BALL LLP

DAVID LEDGER
ELYZE J. MCDONALD
Attorneys for Plaintiff
Jan's Helicopters Service, Inc.

CARLSMITH BALL LLP

DAVID LEDGER
ELYZE J. MCDONALD
Bank of Hawaii Bldg., Suite 401
134 West Soledad Avenue, P.O. Box BF
Hagåtña, Guam 96932-5027
Tel No. 671.472.6813

Attorneys for Plaintiff
Jan's Helicopter Service, Inc.

IN THE DISTRICT COURT OF GUAM

| | |
|---|---|
| JAN'S HELICOPTER SERVICE, INC., | CIVIL CASE NO. CIV03-00002 |
| Plaintiff, | **DECLARATION OF DAVID LEDGER IN SUPPORT OF PLAINTIFF'S MEMORANDUM IN OPPOSITION TO DEFENDANT'S AMENDED MOTION TO DISMISS FOR FAILURE TO STATE A CLAIM OR, IN THE ALTERNATIVE, TO TRANSFER** |
| vs. | |
| FEDERAL AVIATION ADMINISTRATION, | |
| Defendant. | |

I, DAVID LEDGER, pursuant to 28 U.S.C. Section 1746, declare under penalty of perjury that the following statements are true and correct:

1.     I have personal knowledge of the facts stated in this declaration.

2.     I would testify as to these facts if called by the Court.

3.     I am licensed to practice law before all courts in Guam and am admitted to practice in this Court.

4.     I am legal counsel for Jan's.

5.     On February 4, 2003, Jan's filed this lawsuit against the FAA.

6.     Attached hereto as Exhibit A is a true and correct copy of a August 23, 2002 letter from the FAA to myself.

7.     Attached hereto as Exhibit B is a true and correct copy of a September 13, 2002 letter from the Guam International Airport Authority to Hansen Helicopters, an affiliate of Jan's.

8.     Attached hereto as Exhibit C is a true and correct copy of Jan's Request for Hearing submitted to the FAA on August 13, 2002.

9.     Attached hereto as Exhibit D is a true and correct copy of the FAA's September 19, 2002 letter in response to Jan's Request for Hearings.

10.    Attached hereto as Exhibit E is a true and correct copy of Jan's September 23, 2002 administrative complaint submitted to the FAA.

11.    Attached hereto as Exhibit F is a true and correct copy of a string of emails between myself and Allan Horowitz of the FAA. Attached as Exhibit F-1 is a true and correct copy of Allen Horowitz' November 22, 2002 letter to me.

12.    Attached hereto as Exhibit G is a true and correct copy of an email faxed to Mr. Horowitz.

13.    Attached hereto as Exhibit H is a true and correct copy of a December 6, 2002 email sent to me by Ed Averman of the FAA.

14.    Attached hereto as Exhibit I is a true and correct copy of my response to Mr. Averman's email.

15.    Attached hereto as Exhibit J is a true and correct copy of pertinent pages of the transcript of proceedings before this Court held on August 21, 2003.

Executed this 17th day of April 2007 at Hagåtña, Guam.


DAVID LEDGER

# EXHIBIT

# "A"



Western-Pacific Region
Office of the Regional Counsel

P. O. Box 92007
Los Angeles, CA 90009-2007

U.S. Department
of Transportation
**Federal Aviation
Administration**

AUG   2002

David P. Ledger, Esq.
CARLSMITH BALL LLP
134 West Soledad Avenue
Bank of Hawaii Building, Suite
  401
P.O. Box BF
Hagatna, Guam  96932-5027

Dear Mr. Ledger:

Re:  Jans Helicopter Service, Inc. - Operation of RPC2702

This responds to your e-mail letter dated August 9, 2002,
addressed to Mr. Lewis Zeigler and your correspondence
dated August 13, 2002, directed to the Federal Aviation
Administration's Regional Counsel.

On or about July 30, 2002, Mr. Zeigler received a phone
call from the Guam Airport Authority informing him that a
Philippine registered Caribou (DHC-4) was using Guam
International Airport as a base of operations to haul
helicopters to other islands in the Western part of the
Pacific Ocean.  Since Mr. Zeigler's office, the San
Francisco International Field Office (SFO-IFO), has
responsibility for all foreign air carrier operations into
the U.S. from the Asia-Pacific region under FAR 129, and
since no one in his office knew anything about any such
foreign operations at Guam, he sent an inquiry to the Guam
Airport Authority.   Mr. Zeigler's e-mail asked the Guam
Airport Authority what they could tell him about the
operation, and since he suspected it to be a foreign
operation that had no approval from the Federal Aviation
Administration under FAR 129, he offered the opinion that
the Caribou operator was not authorized to operate from
Guam.  At no point did Mr. Zeigler direct the Guam Airport
Authority or anyone else to stop the operation or deny the
aircraft access to the ramp. It should also be noted that
as of the date of your e-mail message, no one from the
Guam Airport Authority had responded to Mr. Zeigler's
message of July 30.

On the date he received your e-mail, Mr. Zeigler contacted the Department of Transportation (DOT) and asked if any permit had been issued to Jan's Helicopters under 14 C.F.R. Part 375. The contact at DOT researched departmental records, going back two years and called Mr. Zeigler back. According to the DOT contact, no evidence could be found of a permit issued to Jan's Helicopters. In fact, the DOT contact was unable to locate any correspondence between Jan's Helicopters and the DOT. We note from one of the enclosures with your August 13 letter that Mr. Walker, a principal of Jans Helicopters, apparently communicated with DOT by e-mail.

In your e-mail letter to Mr. Zeigler, you state that a DOT representative wrote: "With the company owning, operating and crewing the Caribou itself, the operation would be authorized by regulation under 375.30 and no additional DOT operating authority would be required." The statement appears to be confirmed by the enclosure to your August 13 letter. However, based upon the information you provided about your client's operations using the Caribou and considering the definition of "commercial air operations" found at 14 C.F.R. Section 375.1, it does not appear that the Caribou operations fall under Section 375.30. You indicate that the Caribou is used to transport helicopters to other islands in the Western part of the Pacific Ocean where the helicopters, for compensation, are used to spot fish in support of commercial fishing operations. Jan's Helicopters use of the Caribou, as described, is a commercial air operation. "Commercial air operations" is defined as –

". . . operations by foreign civil aircraft engaged in flights for the purpose of crop dusting, pest control, pipeline patrol, mapping, surveying, banner towing, skywriting, or similar agricultural and industrial operations performed in the United States, and any operations for remuneration or hire to, from or within the United States including air carriage involving the discharging or taking on of passengers or cargo at one or more points in the United States, including carriage of cargo for the operator's own account if the cargo is to be resold or otherwise used in the furtherance of a business other than the business of providing carriage by aircraft, but excluding operations pursuant to foreign air carrier permits issued under section 402 of the Act, exemptions,

and all other operations in air transportation." (Emphasis added.)

14 C.F.R. Section 375.1.

The helicopters transported in the Caribou are "cargo for the operator's (Jan's Helicopters) own account" and are being used "in the furtherance of a business other than the business of providing carriage by aircraft." Therefore, because this is a commercial air operation using a foreign registered civil aircraft, a permit is required. See, 14 C.F.R. Section 375.40.

Thus, even though it was based upon incomplete information and an incorrect assumption, it appears that Mr. Zeigler's conclusion was accurate. Jan's Helicopters is not authorized to conduct its present operations out of Guam International Airport with the foreign registered Caribou.

This is only a preliminary finding based upon the information currently available to the FAA. But attorneys from the DOT, after being apprized of the same information, reached the same conclusion.

We are aware that the Guam Airport Authority on August 13, 2002, temporarily lifted the restriction on the Caribou, allowing it to operate. However, we are providing a copy of this letter to officials at the airport. To ensure Jans Helicopters' ability to continue operations with the Caribou, you need to contact the Department of Transportation's Office of International Aviation, Foreign Carrier Licensing Division (X-45) and submit an application for the required permit. A copy of the application can be found at Appendix A to Part 375.

**ER 056**

Questions regarding this matter may be directed to the
undersigned at 310-725-7101.

Sincerely,

Monroe P. Balton
Regional Counsel

cc:
Lewis Zeigler, SFO-IFO
Gerard Bautista, Guam Airport
Authority
Pete Beckner, Manager, HNL FSDO
George Wellington, DOT X-45
Mark Bury, AGC-7

# EXHIBIT

# "B"



A.B. WON PAT
ATURIDAT PUETTON BATKON AIREN GUAHAN ENTENASIONAT
**GUAM INTERNATIONAL AIRPORT AUTHORITY**

September 13, 2002

John Walker
President
Hansen Helicopters
P.O. Box 9099
Tamuning, Guam 96931

Dear Mr. Walker,

We are in receipt of your letter addressed to Hansen Helicopters' attorney, Mr. David P. Ledger, Esq., dated August 23, 2002 from Mr. Monroe P. Balton, Esq. Regional Counsel FAA, Western Pacific Region in reference to a Philippine registered Caribou aircraft. Mr. Balton related that the Federal Aviation Administration (FAA) preliminarily determined that "Jan's Helicopters is not authorized to conduct its current operations out of Guam International Airport with the foreign registered Caribou."

The Airport has no tenant or licensee/permitee by the name of Jan's Helicopter operating out of Guam and the only Caribou aircraft operating out of our Airport is with Hansen Helicopters. On July 25, 2002, we received a renewal landing permit application which appears to indicate that Hansen's Helicopters is listing the same Philippine registered Caribou which also belongs to Jan's Helicopters. On July 31, 2002, the airport imposed a restriction on the operation of that Philippine registered aircraft based on FAA communications that this aircraft was not authorized to operate out of our Airport. However, the Airport temporarily lifted the restriction on the Philippine registered Caribou and its operations on August 13, 2002 until further consultation with the FAA and our attorneys.

The aforementioned letter provided by FAA;s counsel, Mr. Balton to Mr. Ledger makes clear that the Philippine registered Caribou aircraft under RPC 2702 is not authorized for use in the conduct of commercial activity or operations on Guam, unless and until such time the proper Department of Transportation permit is obtained pursuant to 14CFR Section 375.40.

Based on the forgoing the Airport is hereby notifying Hansen Helicopters and/or Jan's Helicopters that the aforementioned Caribou aircraft is restricted from, and therefore not authorized to be used for commercial air activity at or out of our Airport.

Sincerely,

Gerald P. Yingling
Executive Manager

cc:   FAA
      Gerard E. Bautista, GIAA Operations

   

# EXHIBIT

# "C"



# CARLSMITH BALL LLP

A LIMITED LIABILITY LAW PARTNERSHIP

BANK OF HAWAII BLDG., SUITE 401

134 WEST SOLEDAD AVENUE, P.O. BOX BF

HAGÁTÑA, GUAM 96932-5027

TELEPHONE (671) 472-6813   FAX (671) 477-4375

WWW.CARLSMITH.COM

August 13, 2002

**VIA FACSIMILE [(310) 725-6816]
and CERTIFIED MAIL
RETURN RECEIPT REQUESTED**

Federal Aviation Administration
Western Pacific Region
Office of the Regional Counsel
P.O. Box 92007
Worldway Postal Center
Los Angeles, California 90009-2007

Re: Jans Helicopter Service, Inc; July 31, 2002 denial of operating authority at Guam International Airport; Request For Hearing Under 14 CFR § 13.35

Dear Regional Counsel:

1. Introduction and background

We are legal counsel for Jan's Helicopter Service, Inc. Jan's is the legal and registered owner of a Guam-based deHavilland Caribou DCH-4A, call sign RPC2702. Jan's uses the Caribou to transport helicopters, also owned by Jan's, to various location in Micronesia. The helicopters are under contract to tuna boat owners who use them to find schools of tuna. The Caribou operation is authorized by regulation under Part 375 -- Navigation of Foreign Civil Aircraft Within the United States, specifically 14 CFR §375.30 -- Operations other than commercial air operations. On March 7, 2000, the U.S. Department of Transportation advised us that no additional DOT operating authority would be required, so long as there was unity of ownership between the Caribou and the helicopter being transported. Jan's only transports helicopters owned by Jan's.

On July 31, 2002, without the required prior notice, legal cause or justification, Lewis I. Ziegler of the FAA arbitrarily and capriciously issued a notice to Guam ATC that Jan's was not authorized to operate the Caribou (Exh. A). Not only did Mr. Ziegler fail to give prior notice of the so-called revocation of authority as required by 14 CFR 13.20(b), Jan's remained completely unaware of the "revocation" until August 9, 2002, when Guam ATC denied ramp access to the Caribou based on Mr. Ziegler's July 31st directive.

But there is much more at stake than a single instance of denied ramp access. Unfortunately, at the time Guam ATC denied ramp access, Jan's was preparing to transport a badly needed helicopter, likewise owned by Jan's, to a waiting customer. As a result, Mr. Ziegler's offhand and illegal revocation of operating authority resulted in an unfulfilled contract and substantial loss of income to Jan's, the precise amount of which has yet to be determined, but could exceed US$1,080,000. Jan's will look to the FAA to recover its losses and damages. Pursuant to 14 CFR § 13.20(c), Jan's hereby contests the FAA's July 31, 2002 revocation of operating authority and requests a hearing on the matter.

2    DOT operating authority was confirmed on March 7, 2000

In early 2000, Jan's corresponded with the DOT regarding operating authority for the Caribou. After exchanging a number of emails, DOT confirmed that its legal department had worked through the issues and determined that operation was authorized by regulation under Part 375 -- Navigation of Foreign Civil Aircraft Within the United States, specifically 14 CFR §375.30 -- Operations other than commercial air operations (Exh. B). Furthermore, DOT advised that no additional DOT operating authority would be required, so long as there was unity of ownership between the Caribou and the helicopter being transported (Exh. B). As noted above, Jan's only transports helicopters owned by Jan's.

3.    Mr. Ziegler's July 31st 2002 illegal revocation of operating authority must be rescinded.

The revocation of authority, Exh. A., warrants close scrutiny and must be rescinded for a number of reasons.

a.  It is arbitrary and capricious.

Exh. A is self-contradictory and arbitrary and capricious. First, Mr. Ziegler admits he knows little, if anything, about the Caribou. He writes, "What can you tell me about a Philippine registered Caribou .... that used to be U.S. registered? Second, he admits he knows little, if anything, about Jan's. He writes "Whoever it is, they aren't authorized .... Nonetheless, armed with little or no information, Mr. Ziegler revokes operating authority -- "....

they aren't authorized to operate [on Guam]." Third, though purporting to revoke operating authority, Exh. A. cites no authority whatsoever.

     b.  It violates 14 CFR § 13.20(b).

    The purpose of §13.20(b) is to provide the person subject to an order under §13.20[1] prior notice and an opportunity to respond, that is to say, *due process of law.* Specifically, 13.20(b) states:

> (b)  Unless the *Administrator* determines that an emergency exists and safety in air commerce requires the immediate issuance of an order under this section, the person subject to the order *shall be* provided with notice prior to issuance.

Section 13.20(b) makes prior notice non-discretionary - prior notice *shall be* provided . What's more, a finding of an emergency in air commerce which warrants a cease and desist order without prior notice is a right reserved to the *Administrator*, not Mr. Ziegler. Here, even though the Administrator did not declare an emergency in air commerce, no prior notice of the order revoking operational authority order was given to Jan's. What's more, until Guam ATC bushwhacked Jan's on August 9, 2002 when the pilot had the Caribou ready to taxi, Jan's had no notice at all of the "order." At that moment, Jan's pilot came up with an expression to aptly describe what had happened, though it is unsuitable for print here. In the circumstances, Jan's was denied due process of law, the July 31st revocation arbitrarily and capriciously violates the law and therefore must be rescinded, and Jan's is entitled to recover it losses and damages from the FAA.

    4.  Conclusion & relief requested.

    The appalling results of August 9, 2002 at the Guam International Airport ramp, without more, demonstrate the purpose underlying the mandatory prior notice provision of 14 CFR §13.20(b). The simple fact is that had Mr. Ziegler followed the law, or taken a moment to enquire about the authority DOT had confirmed for the Caribou on March 7, 2000, more likely than not none of this would have occurred. Unfortunately, Mr. Ziegler disregarded due process and instead chose to arbitrarily and capriciously revoke operating authority and dismiss the consequences. Jan's requests the following relief:

---

[1]Even though the July 31, 2002 letter cites neither authority nor other legal justification, it has the effect of a cease and desist and denial order issued under authority of 14 CFR § 13.20 - Orders of compliance, cease and desist orders, orders of denial, and other orders.

1. Immediate recission of the illegal July 31st 2002 revocation of authority.

2. Written prior notice of any question regarding its authority under 14 CFR § 375.30.

3. Damages for loss of contract revenues and consequential damages caused as a result of the Caribou being illegally denied ramp access on August 9, 2002.

4. A hearing on the earliest possible date.

Respectfully submitted,

David Ledger
Attorney for Jan's Helicopter Service, Inc.

DPL:jmc
3144170.1.051998-00011

----- Original Message -----
From: Wellington, George <George.Wellington@ost.dot.gov>
To: J. Walker (E-mail) <jwalker@kuentos.guam.net>
Sent: Tuesday, March 07, 2000 11:59 AM
Subject: Part 375/USDOT


> David--
> Sorry for the delay in responding, but we've now worked your
> questions through our legal people, and here are the answers:
>
> Scenario #1: With the company owning, operating, and crewing the
> Caribou itself, the operation would be authorized by regulation under
> section 375.30, and no additional DOT operating authority would be
required.
>
> Scenario #2: With a subsidiary involved, and thus direct or indirect
> compensation, the operation would require either a foreign aircraft permit
> under section 375.42, or an exemption under 49 U.S.C. 40109. Operations
> authorized by permit under Part 375 are strictly limited to six flights
per
> calendar year, and any operations in excess of that number could be done
> only if the operator received exemption authority under 40109 (FYI, 40109
is
> common carrier authority, of the type held, for example, by British
Airways
> or Air Canada). In either case, we could not act on the request until the
> Federal Aviation Administration had reviewed the operator and given us
> written clearance, and that could prove to be a time-consuming process,
> given the distances involved.  So, from a timing/ease of operation point
of
> view, scenario #1 would present far fewer problems.
>
> Whether operating under Scenario #1 or #2, the operator would need
> to comply with applicable FAA requirements, including those in 14 CFR Part
> 91.
>
> I hope this helps.  If you have any further questions, let me know.
> George



# EXHIBIT B

CARLSMITH BALL LLP

DAVID P. LEDGER
134 West Soledad Avenue
Bank of Hawaii Bldg., Suite 401
P.O. Box BF
Hagåtña, Guam 96932-5027
Tel. No. (671) 472-6813

Attorneys for Respondent
Jans Helicopter Service, Inc.

## CERTIFICATE OF SERVICE

I, David P. Ledger, hereby certify and state that:

1.      I am a United States citizen over the age of 18 years;

2.      I am an Attorney of the law firm of Carlsmith Ball LLP.

3.      On the 13th day of August 2002, I caused to be served, a copy of the Request

for Hearing, via regular and certified mail to the following:

| | |
|---|---|
| Federal Aviation Administration<br>Western Pacific Region<br>Office of the Regional Counsel<br>Post Office Box 92007<br>Worldway Postal Center<br>Los Angeles, California 90009-2007 | Hearing Docket, Room 924A<br>Federal Aviation Administration<br>800 Independence Avenue, S.W.<br>Washington, D.C. 20591 |
| Federal Aviation Administration<br>Don M. Hamilton<br>Clarence Kanae<br>Western Pacific Region<br>Honolulu Flight Standards District Office<br>135 Nakolo Place<br>Honolulu, Hawaii 96819-1845 | Lewis I. Ziegler<br>Federal Aviation Administration<br>Western Pacific Region<br>Office of the Regional Counsel<br>Post Office Box 92007<br>Worldway Postal Center<br>Los Angeles, California 90009-2007 |

DATED this _13th_ day of August 2002.

DAVID P. LEDGER

3144193.1.051998-00011

# EXHIBIT

# "D"



U.S. Department
of Transportation
**Federal Aviation
Administration**

**SEP 1 9 2002**

David P. Ledger, Esq.
CARLSMITH BALL LLP
134 West Soledad Avenue, Suite
 401
P.O. Box BF
Hagatna, Guam 96932-5027

Dear Mr. Ledger:

Re:    Requests For Hearings

This is a final response to your requests that the Federal
Aviation Administration (FAA) convene hearings to resolve
the matters raised in your electronic mail (e-mail) to
Lewis Ziegler on August 9, 2002, regarding the operations
of the Philippine registered Caribou owned by your client,
Jans Helicopter Service and your letters to me dated
August 13, 2002, regarding the Caribou and raising another
matter, the letter issued by the Honolulu Flight Standards
District Office to another of your clients, Americopters
LLC, directing them to cease operating from the heliport
located on the roof of Chuck's Steakhouse in Upper Tumon,
Guam.

In support of your requests for hearings in these matters,
you cite to Federal Aviation Regulation (FAR) 13.20(b).
This FAR is part of Subpart C of Part 13.  Subpart C
applies to legal enforcement actions, and FAR 13.20 sets
forth the procedures for requesting a hearing where the
FAA has issued orders of compliance, cease and desist
orders, orders of denial, and other orders.  Only the
following individuals have authority to issue such orders,
the Chief Counsel, the Deputy Chief Counsel, and each
Assistant Chief Counsel (including Regional and Center
Counsels).  See FAA Order 2150.3A, para. 1209(b).  No such
orders were issued with respect to the operations of the
Caribou by Jans Helicopter Service or with respect to
Americopters flights using the Chuck's Steakhouse
heliport.

**EXHIBIT D**

ER 018

Neither Mr. Ziegler's e-mail to the Guam International
Airport Authority nor Mr. Kanae's letter to Mr. Rufus
Crowe constitutes an order as that term is contemplated by
the Part 13, Subpart C. Therefore your requests are
denied.

If you consider filing a formal complaint under FAR 13.5,
you should be aware that that section does not apply to
complaints against the Administrator or complaints against
FAA employees acting within the scope of their employment.
FAR 13.5(a).

Sincerely,

Monroe P. Belton
Regional Counsel

# EXHIBIT

# "E"



# CARLSMITH BALL LLP

A LIMITED LIABILITY LAW PARTNERSHIP

BANK OF HAWAII BLDG., SUITE 401
134 WEST SOLEDAD AVENUE, P.O. BOX BF
HAGÅTÑA, GUAM 96932-5027
TELEPHONE (671) 472-6813   FAX (671) 477-4375
WWW.CARLSMITH.COM

September 23, 2002

**CERTIFIED MAIL**
**RETURN RECEIPT REQUESTED**

Federal Aviation Administration
Office of the Chief Counsel
Attention: Enforcement Docket (AGC-10)  800
Independence Avenue, S.W.
Washington D.C. 20591

Re: **COMPLAINT UNDER 14 C.F.R. 13.5 FOR AN ORDER TO RESCIND
FAA'S JULY 31, 2002 ORDER GROUNDING CARIBOU PRC2702
AND REVOKING PART 375.30 OPERATING AUTHORITY**

Chief Counsel:

### A.    Introduction

We are legal counsel for Jan's Helicopter Service, Inc. Jan's is the legal and
registered owner of a Guam-based deHavilland Caribou DCH-4A, call sign RPC2702. Jan's
uses the Caribou to transport helicopters, also owned by Jan's, to various location in Micronesia.
Once delivered, the helicopter is **not** used in "the furtherance of Jan's business," within the
meaning of 14 C.F.R. 375.1 (definition of commercial air operations). In the circumstances, no
operating authority other than 14 C.F.R. §375.30 -- Operations other than commercial air
operations -- is required

Jan's has operated under Part 375 -- Navigation of Foreign Civil Aircraft Within
the United States, and specifically §375.30 -- Operations other than commercial air operations --
since March 7, 2000 when the U.S. Department of Transportation advised that no additional
DOT operating authority would be required. (See Exh. A - "Scenario #1"). Such authority was
conditional upon, among other things, unity of ownership between the Caribou and the helicopter

and that once delivered, the helicopter would not be used in the furtherance of Jan's business.
Jan's has met these conditions.

Nonetheless, on July 31, 2002, the FAA, through Mr. Lewis I. Zeigler of the San
Francisco International Field Office, without prior notice, issued an unauthorized order which
stripped Jan's of Part 375.30 operating authority and caused the Caribou to be illegally grounded
by Guam International Airport authorities. (See Exhibit B). By this complaint, Jans contests that
unauthorized order on the grounds that it constitutes a violation within the meaning of 14 C.F.R.
13.1, 14 C.F.R. 13.20, and other applicable rules, regulations and law.      .

        B.     Factual allegations common to all claims for relief.

        1.     On July 31, 2002, Mr. Lewis I. Zeigler, without authority, legal
cause, other justification or prior notice, acted outside the scope of his employment and issued a
directive to the Guam Airport authorities which stated that the Caribou was not "authorized to
operate [on Guam]" and caused the authorities to ground the Caribou. (Exh. B).

        2.     The July 31st directive had the equivalent effect of an order issued
pursuant to 14 C.F.R. 13.20 and, what's more, arbitrarily and capriciously misinformed Guam
International Airport authorities that the Caribou was not "authorized to operate [on Guam]."
(See Exh. B). Furthermore, Mr. Zeigler did not provide Jan's "with notice prior to issuance" of
the July 31st order, even though such notice is mandatory under 14 C.F.R. 13.20(b).

        3.     Not only did Mr. Zeigler fail to give the mandatory prior notice of
his unauthorized order grounding the Caribou, Mr. Zeigler kept his order secret even after he
issued it. As a result, on August 9, 2002, as the Caribou was preparing to taxi, the Guam Airport
authorities denied ramp access to the Caribou.

        4.     As a result, Jan's asked the Guam Airport authorities to justify
their actions in denying ramp access. The authorities responded by informing Jan's that the FAA
had revoked the Caribou's operating authority and by faxing Exh. B - Mr. Zeigler's July 31st
email - to Jan's.

        5.     The response of the Guam Airport authorities as described above is
compelling and sufficient proof that Mr. Zeigler's July 31st directive is in substance and effect no
different from an order issued pursuant to 14 C.F.R. 13.20 preventing the Caribou from flying
under Part 375.30.

6.    However, Mr. Zeigler did not provide Jans's "with notice prior to issuance" of his order, even though such notice is mandatory under 14 C.F.R. 13.20(b).

7.    Mr. Zeigler's unauthorized order had, and continues to have, the effect of a legal grounding order issued under 14 C.F.R. 13.20. That is to say, the FAA refuses to recognize Jan's Part 375.30 operating authority and Jan's is unable to fly the Caribou for its intended purpose.

8.    As a result of the events described above, especially being grounded without prior notice or any opportunity to respond, on August 13, 2002, pursuant to 14 C.F.R. 13.35, Jan's requested a hearing. (Exh. C).

9.    On September 19, 2002, the Office of the Regional Counsel denied Jan's request for a hearing on quintessential "catch 22" grounds: since Mr. Zeigler had no authority to issue the §13.20 denial of authority order, it is "not really an order" under 14 C.F.R. 13.20, and therefor Jan's is not entitled to the hearing provided for by 14 C.F.R. 13.35. (See Exh. D). In other words, Mr. Zeigler is unauthorized cop, judge and jury and enforcer, and Jan's has no right to be heard or to a remedy.

>    **Count I**    Mr. Zeigler acted outside the scope of his employment and authority and is subject to a formal complaint under 14 C.F.R. 13.5.

10.    Paragraphs 1 through 9 are incorporated herein by reference.

11.    Mr. Zeigler's July 31st grounding order has the equivalent force and effect of, and is otherwise the same in substance, as an authorized grounding order issued pursuant to 14 C.F.R 13.20. Proof of this is simple and compelling -- Guam Airport authorities grounded the Caribou on the authority of Mr. Zeigler's written communication to them that the Caribou "was not authorized to operate [on Guam]" and Jan's is unable to operate under Part 375.30.

12.    Only the Chief Counsel, the Deputy Chief Counsel, and each Assistant Chief Counsel (including Regional and Center Counsels) are authorized to issue orders such as the one Mr. Zeigler issued. (See FAA Order 2150.3A, para. 1209(b); see also Exh. D hereto, 2d para.).

13.     Part 13.5 and formal complaints issued thereunder do apply to employees of the FAA who have acted outside the scope of their employment and authority. (See Part 13.5 (a)).

14.     Since Mr. Zeigler admittedly had no authority to issue his July 31st grounding order to Guam Airport authorities, his actions were personal and outside the scope of his employment and authority and, accordingly, subject to a formal complaint under 14 C.F.R. 13.5.

**Count II**     Zeigler's unauthorized order violates 14 C.F.R. § 13.20(b)

15.     Paragraphs 1 through 14 are incorporated herein by reference.

16.     The purpose of 14 C.F.R. 13.20(b) is to provide the person subject to an order pursuant to Part 13.20 prior notice and an opportunity to respond. Section 13.20(b) states:

> Unless the *Administrator* determines that an emergency
> exists and safety in air commerce requires the immediate
> issuance of an order under this section, the person subject
> to the order *shall be provided with notice prior to issuance.*

17.     Here, the Administrator neither determined that an emergency existed nor that safety in air commerce required the immediate issuance of Mr. Zeigler's order denying operating authority.

18.     Mr. Zeigler did not provide Jan's with the mandatory notice prior to issuing his order on July 31, 2002. What's more, Mr. Zeigler did not give afterwards but instead kept the order secret.

19.     Mr. Zeigler's personal acts and omissions constitute a violation of 14 C.F.R. 13.20(b) and a violation within the meaning of 14. C.F.R. 13.1.

20.     Mr. Zeigler's unauthorized grounding order dated July 31, 2002 constitutes a violation of 14 C.F.R. 13.20(b) and a violation within the meaning of 14. C.F.R. 13.1.

**Count III**     The unauthorized order violates due process.

21.     Paragraphs 1 through 20 are incorporated herein by reference

22.     Mr. Zeigler's unauthorized grounding order dated July 31, 2002 constitutes a violation of the due process requirement imposed by 14 C.F.R. 13.20(b) and therefore, an illegal taking of Jan's property.

C.     Relief requested.

1.     An investigation pursuant to 14 C.F.R., Subpart A.

2     A Letter of Correction pursuant to Part 13.11(b)(2) to immediately rescind the unauthorized July 31, 2002 grounding order and restore Part 375.30 operating authority.

3.     Assessment of civil penalties pursuant to Parts 13.15 and 13.16 according to proof.

4.     Actual and consequential damages according to proof.

5.     Attorney's fees and costs.

D.     Service of this Complaint

Pursuant to 14 C.F.R.13.5(d), this complaint should be served on the following person at the address indicated:

Mr. Lewis I. Zeigler
Federal Aviation Administration
San Francisco International Field Office
831 Mitten Road, Room 105
Burlingame, California 96010-1303

Federal Aviation Administration
Office of the Chief Counsel
September 23, 2002
Page 6

Submitted by:

David Ledger
Attorney for Jan's Helicopter Service, Inc.

DPL:jmc
3144146.1.051998-00034

> David--
> Sorry for the delay in responding, but we've now worked your
> questions through our legal people, and here are the answers:
>
> Scenario #1: With the company owning, operating, and crewing the
> Caribou itself, the operation would be authorized by regulation under
> section 375.30, and no additional DOT operating authority would be
required.
>
> Scenario #2: With a subsidiary involved, and thus direct or indirect
> compensation, the operation would require either a foreign aircraft permit
> under section 375.42, or an exemption under 49 U.S.C. 40109. Operations
> authorized by permit under Part 375 are strictly limited to six flights
per
> calendar year, and any operations in excess of that number could be done
> only if the operator received exemption authority under 40109 (FYI, 40109
is
> common carrier authority, of the type held, for example, by British
Airways
> or Air Canada). In either case, we could not act on the request until the
> Federal Aviation Administration had reviewed the operator and given us
> written clearance, and that could prove to be a time-consuming process,
> given the distances involved. So, from a timing/ease of operation point
of
> view, scenario #1 would present far fewer problems.
>
> Whether operating under Scenario #1 or #2, the operator would need
> to comply with applicable FAA requirements, including those in 14 CFR Part
> 91.
>
> I hope this helps. If you have any further questions, let me know.
> George


# EXHIBIT A



# Message

dansn@gua



Move to: Sent

ATT. MIKE

Message 21 of 28 (N

**To:** gerardb@guamcell.net, dansn@guamcell.net

**From:** Lewis.I.Zeigler@faa.gov

**Date:** 31 Jul 2002, 04:09:11 AM

**Subject:**

Mr. Bautista and Mr. San Nicolas;

What can you tell me about a Philippine registered Caribou (DHC-4) that i
supposed to be based on Guam and flying around the islands? Supposedly it
used to be a U.S. registered aircraft and is hauling some small helicopte
that are used on fishing boats. Whoever it is they aren't authorized to
operate there.

Best regards,

Lew Zeigler





Move to: Sent

## EXHIBIT B

# EXHIBIT

## "F"



**"David Ledger"**
**<dledger@carlsmith.co**
**m>**

To: Allan Horowitz/AWA/FAA@FAA
cc:
Subject: Re: Jans Helicopter Service and Americopters LLC



12/03/02 04:58 PM

Allan- Thank you, so far nothing has arrived. Perhaps you can fax it to me as my clients are anxious to make a decision as to the next step. Frankly, we are not expecting the FAA's response to meet our expectations and would just as soon move on to our next options as soon as possible. In any event, I shall make good on my word and take no action until we see the response you refer to. Again, if you could fax it I would appreciate it very much.

David Ledger
dledger@carlsmith.com
Tel:  671-472-6813
Fax: 671-477-4375

>>> <allan.horowitz@faa.gov> 12/04/02 12:45AM >>>



Dear Mr. Ledger,

I accordance with my telephone conversation with you, by letter dated Novemeber 22, 2002, the FAA responded to your September 23 letter, which you styled as a formal complaint. The FAA's letter was sent by "Certified Mail-Return Receipt Requested." If you do not receive it in the next several days, please contact me and we will re-send it.

|  | **"David Ledger"** | | |
|---|---|---|---|
|  | **<dledger@carlsmit** | To: | Allan |
| Horowitz/AWA/FAA@FAA |  |  |  |
|  | **h.com>** | cc: |  |
|  |  | Subject: | Jans Helicopter |
| Service and |  |  |  |
|  | 11/26/02 05:18 PM | Americopters LLC | |



Dear Mr. Horowitz: About three weeks ago you told me I would hear from you in about one week in regards to my clients' Part 13.5 complaints, which were lodged more than two months ago. I have not heard from you. Before being put in touch with you, we basically got nothing but a run-around from the FAA Washington D.C. office for a month or more. The only FAA official who has actually responded to the matter and done anything substantive is Mr. Monroe Balton. Unfortunately, Mr. Balton is, at least for now, apparently out of the picture. Accordingly, we consider all applicable administrative remedies to be exhausted and my clients will seek remedies in the USDC for Guam. If we hear from you before our action is actually filed, we will reconsider in the light of the content of your response.

Very Truly yours,

David Ledger

dledger@carlsmith.com
Tel:  671-472-6813
Fax: 671-477-4375

# EXHIBIT

# "F-1"



**U.S. Department
of Transportation**

**Federal Aviation
Administration**

800 Independence Ave., S.W.
Washington, D.C. 20591

November 22, 2002

<u>CERTIFIED MAIL - RETURN RECEIPT REQUESTED</u>

Carlsmith Ball LLP
Attn: Mr. David Ledger
134 West Soledad Avenue
P.O. Box BF
Hagåtña, Guam 96932-5027

      Re:    <u>Complaint Under 14 C.F.R. § 13.5 For An Order
               To Rescind FAA's July 31, 2002, Order Grounding
               Caribou PRC2702 And Revoking Part 375.30
               Operating Authority</u>

Dear Mr. Ledger:

This responds to your September 23 letter to the Federal Aviation Administration's (FAA) Office of the Chief Counsel, which you styled as a formal complaint against Mr. Lewis F. Zeigler, an Aviation Safety Inspector assigned to the agency's San Francisco International Field Office. Your letter asserts that Mr. Zeigler acted outside the scope of his employment by issuing an order of a type described in 14 C.F.R. § 13.20 when he had no authority to do so. I have reviewed your letter and its attached exhibits and have determined that the document issued by Mr. Zeigler was not tantamount to an order, nor was Mr. Zeigler acting outside the scope of his employment.

As you indicated in your letter, on July 31, 2002, Mr. Zeigler sent an E-mail message to Messrs. Bautista and Nicolas, who were, according to your letter, employees of the Guam International Airport Authority. His message inquired about certain activities of an unidentified Caribou aircraft operating in Guam, and concluded by stating: "Whoever it is they aren't authorized to operate there." Your letter further indicates that, after receiving Mr Zeigler's E-mail message, the Guam International Airport authorities denied ramp access to the Caribou aircraft operated by your client, Jan's Helicopter Service, Inc. (Jan's), thereby effectively grounding the Caribou. You state further that the airport authorities responded to an inquiry from Jan's asking them to justify their actions by informing Jan's that "the FAA had revoked the Caribou's operating authority and by faxing Exh. B - Mr. Zeigler's July 31st email - to Jan's."

**EXHIBIT G**

It appears that Jan's was operating the Caribou under Part 91 and had not been issued any permit or authority by the United States Department of Transportation (DOT). Your letter states that, on March 7, 2000, DOT advised Jan's that "no additional DOT operating authority would be required." In apparent support of that statement, you attached a copy of an E-mail dated March 7, 2000, from DOT's George Wellington sent to "J. Walker" but directed to "David." Mr. Wellington's E-mail addressed two scenarios that were based on questions that had been sent to him. You appear to be relying on Mr. Wellington's conclusion regarding his "scenario #1" to support your statement.

> Scenario #1 is: "With the company owning, operating, and crewing
> the Caribou itself, the operation would be authorized by regulation
> under section 375.30, and no additional DOT operating authority would
> be required."

Nothing was stated concerning the Caribou's hauling the helicopters or the ultimate use of the helicopters after they reached their destination.

> Scenario #2 is: With a subsidiary involved, and thus direct or indirect
> compensation, the operation would require either a foreign aircraft permit
> under section 3775.42, or an exemption under 49 U.S.C. 40109. Operations
> authorized by permit under Part 375 are strictly limited to six flights per
> calendar year, and any operations in excess of that number could be done only
> if the operator received exemption authority under 40109 (FYI, 40109 is
> common carrier authority, of the type held, for example, by British Airways . . . ).

Mr. Wellington concluded by stating:

> In either case, we could not act on the request until the Federal Aviation
> Administration had reviewed the operator and given us written clearance,
> and that could prove to be a time-consuming process, given the distances
> involved. So, from a timing/ease of operation point of view, scenario #1
> would present far fewer problems.

Mr. Wellington's E-mail did not discuss any specifics of Jan's operation; nor did it venture an opinion on whether Jan's operations were commercial air operations under the definition set forth in 14 C.F.R. § 375.1, which would render section 375.30 inapplicable and require Jan's to obtain DOT authority.

As the Regional Counsel for the FAA's Western Pacific Region explained in his August 23, 2002, letter to you, Mr. Zeigler's office has safety oversight responsibility for all foreign air carrier operations into the United States from the Asia-Pacific region. The Regional Counsel further explained that Mr. Zeigler's E-mail inquiry was prompted by a telephone call he received from an official of the Guam International Airport Authority informing him that a Philippine-registered Caribou aircraft was using Guam International Airport as a base of operations to haul helicopters to other islands in the Western part of the Pacific Ocean. Because no one in his office was aware of any such foreign operations in Guam, Mr. Zeigler's

E-mail asked the Guam authorities what they could tell him about the operation. Since Mr. Zeigler suspected it to be a foreign operation that had no approval from the FAA under 14 C.F.R. part 129, he offered the opinion that the Caribou operator was not authorized to operate from Guam. Accordingly, the statements made by Mr. Zeigler in his July 31 E-mail message were in consonance with his safety oversight responsibilities, and that he was acting within the scope of his employment by sending the E-mail message to the Guam International Airport authorities.

Whatever action the Guam International Airport Authority took after it received Mr. Zeigler's E-mail, it cannot reasonably be said that the E-mail directed the Authority to perform any specific act or to refrain from performing any act. There is nothing in Mr. Zeigler's E-mail that is, as you state in your letter, in the nature of a "directive," or that is "in substance and effect no different from an order issued pursuant to 14 C.F.R. 13.20."

The formal complaint process set forth in 14 C.F.R. § 13.5 does not apply to complaints against an employee of the FAA acting within the scope of his or her employment. In view of my determination that the E-mail message at issue was not an order of a type described in 14 C.F.R. § 13.20, and that Mr. Zeigler was acting within the scope of his employment, I am forwarding your letter to the Director of the FAA's Flight Standards Service for appropriate handling.

Sincerely,

Allan H. Horowitz
Manager, Enforcement Division, AGC-300

# EXHIBIT

# "G"

 

# CARLSMITH BALL LLP

A LIMITED LIABILITY LAW PARTNERSHIP

BANK OF HAWAII BLDG., SUITE 401

134 WEST SOLEDAD AVENUE, P.O. BOX BF

HAGÁTÑA, GUAM 96932-5027

TELEPHONE (671) 472-6813    FAX (671) 477-4375

WWW.CARLSMITH.COM

## FACSIMILE TRANSMISSION

UNLESS OTHERWISE INDICATED OR OBVIOUS FROM THE NATURE OF THE TRANSMITTAL, THE INFORMATION CONTAINED IN THIS FACSIMILE MESSAGE IS ATTORNEY PRIVILEGED AND CONFIDENTIAL INFORMATION INTENDED FOR THE USE OF THE INDIVIDUAL OR ENTITY NAMED BELOW. IF THE READER OF THIS MESSAGE IS NOT THE INTENDED RECIPIENT, OR THE EMPLOYEE OR AGENT RESPONSIBLE FOR DELIVERING IT TO THE INTENDED RECIPIENT, YOU ARE HEREBY NOTIFIED THAT ANY DISSEMINATION, DISTRIBUTION OR COPYING OF THIS COMMUNICATION IS STRICTLY PROHIBITED. IF YOU HAVE RECEIVED THIS COMMUNICATION IN ERROR OR ARE NOT SURE WHETHER IT IS PRIVILEGED, PLEASE IMMEDIATELY NOTIFY US BY COLLECT TELEPHONE AND RETURN THE ORIGINAL MESSAGE TO US AT THE ABOVE ADDRESS VIA THE U.S. POSTAL SERVICE AT OUR EXPENSE. THANK YOU.

**DATE:**          December 5, 2002

| TO:                Name | Fax No. | Phone No. |
|---|---|---|
| Federal Aviation Administration<br>Mr. Allan Horowitz | 1-202-267-3227 | 1-202-267-33139 |

**FROM:**         David Ledger

**NUMBER OF PAGES INCLUDING THIS COVER SHEET: 2**

**CASE NAMES:**     Americopters LLC

                Jan' Helicopter Service

                Complaints filed under 14 C.F.R. 13.5

**MESSAGE:**   Dear Mr. Horowitz: A print-out of my most recent email message to you follows. Thank you

If problems occur, please call our Telecopier Operator at (671) 472-6813.

From:       David Ledger
To:         allan.horowitz@faa.gov
Subject:    Re: Jans Helicopter Service and Americopters LLC

Dear Mr. Horowitz: I received a fax copy of your November 22, 2002 written response to the formal
complaint we sent in on behalf of Jans Helicopter Service. Thank you. However, I did not receive any
response to the formal complaint we sent in on behalf of Americopters. Both formal complaints were
dated September 23, 2002 and both faxed to Mr. Peter Lynch on November 8, 2002. If you did **not**
receive the formal complaint on behalf of Americopters, **please inform me of your fax number and I will
re-fax it directly to you.** If you did receive Americopters' formal complaint, please inform me if you intend
to reply in the same fashion as you did for Jan's, that is, in writing, and if so when.

Regarding your response to the formal complaint against Mr. Zeigler, it goes without saying that we
disagree with your conclusions and also take exception with certain of your findings. It was arbitrary and
capricious, and also extremely costly to Jan's, for Mr. Zeigler to cause the Caribou to be grounded before
making any enquiry at all as to the nature of its operations and, if he was so curious, what happened to a
helicopter after it was delivered to its destination by the Caribou. Had Mr. Zeigler bothered to make even
a minimal enquiry, he would have learned that the Caribou operation was specifically structured to comply
with "Scenario #1. Under Scenario #1, the operation would be authorized by Part 375.30 because it would
not constitute "commercial air operations." Even if Mr. Zeigler was not satisfied with what he learned,
Jan's would have had an opportunity to state its case and then agree or disagree with whatever
conclusion Mr. Zeigler made. Instead, if you do not already know, no one said anything to Jan's, asked for
clarification of the Caribou's operation, or gave notice that the aircraft was grounded until after the airplane
was crewed, tanked up, running and on the ramp requesting clearance. Moreover, at the time the
Caribou was denied clearance for allegedly conducting "unauthorized commercial air operations," it was in
fact not. Rather, the Caribou was simply being taken up for a routine check-ride in preparation for a
planned flight. In other words, at that time the Caribou had every right to fly. We think what the Guam
Airport pulled on Mr. Zeigler's order was a pretty cheap shot. Actually, our description of the manner in
which Jan's was treated is not really fit for print here. A simple courtesy phone call from either Mr.
Zeigler's office (who, as you confirm, has responsibility for commercial air ops on Guam) or Guam Airport
Authority officials would have been all that was necessary to fairly and professionally address the issues
and avoid what happened. Instead, what Jan's got was a blind-side slap in the back of the head and lost
business opportunity, for which we believe someone should and will eventually answer. I am not certain
what "appropriate handling" you refer to in the closing paragraph of your November 22, 2002 letter.
Whatever it is, it will likely be more of the same so we will, accordingly, consider your response to be the
FAA's final conclusion and disposition of Jan's formal complaint. If this is incorrect on my part, please let
me know.

As to your curiosity about Mr. Wellington's email being addressed to "J. Walker" but directed to "David," J.
Walker is the principal behind the corporation Jan's Helicopter Service and Caribou owner (and, by the
way, rather well-known to Guam Airport Authority officials who participated in the illegal Caribou
grounding), and "David" is me, Mr. Walker and Jan's legal counsel. What did you think, we were using
Mr. Wellington's advice to support our position on this matter when it actually applied to some other
matter?

In closing, I again ask that you inform me of your intentions, if any, with regard to the formal complaint we
sent in on behalf of Americopters.

Very truly yours,

# EXHIBIT

# "H"





**Ed Averman**
12/06/2002 05:31 PM

To: dledger@carlsmith.com
cc:
Subject: December 5 E-mail message to Allan Horowitz

Dear Mr. Ledger:

Thank you for your E-mail message to Allan Horowitz concerning two letters dated
September 23 and styled as Formal Complaints that you sent to the FAA's Office of the
Chief Counsel. In your E-mail message you addressed some issues related to your
letter concerning FAA Inspector Zeigler and Jan's Helicopter Service and our response
to you dated November 22. In addition, you asked what our office intended to do in
response to your other letter, which involved Americopters.

In our November 22 letter to you, we included references to Mr. Wellington's March 7
E-mail message, not to question to whom it was addressed, but to point out that
Mr. Wellington's message in no way gave approval to the operations Jan's was
conducting. Rather, his message addresses only two possible scenarios without indicating
in any manner that one of them applied specifically to Jan's operations. Moreover, we
noted that Mr. Wellington concluded by stating: "In either case, we could not act on the
request until the Federal Aviation Administration had reviewed the operator and given
us written clearance, and that could prove to be a time-consuming process, . . . ."
Mr. Wellingon's only conclusion respecting the first scenario (the one on which you
appear to rely to support the propriety of Jan's operations) is: "So, from a timing/ease
of operations point of view, scenario #1 would present far fewer problems." This
conclusion did not purport to authorize any operations Jan's was conducting.

You may want to discuss your issues with the Guam International Airport Authority.
In our opinion, Mr. Zeigler's E-mail message did not order it or its officials to do
anything.

As to your letter involving Americopters, we are currently evaluating whether the letter
satisfies the docketing requirements in 14 C.F.R. 13.5. You raised some complex issues
that must be resolved through discussions with the agency's Flight Standards Service.
We hope to have a response to you next week.

Ed Averman

# EXHIBIT

# "I"



 **"David Ledger"**
<dledger@carlsmith.com>

01/02/2003 01:09 AM

To: Ed Averman/AWA/FAA@FAA
cc:
Subject: Re: December 5 E-mail message to Allan Horowitz

Dear Mr. Averman:  Please inform me if you will or will not be responding to
our Part 13.5 complaint with regard to Americopters. Thank you.

David Ledger
dledger@carlsmith.com
Tel:  671-472-6813
Fax: 671-477-4375

>>> <ed.averman@faa.gov> 12/07/02 08:31AM >>>
Dear Mr. Ledger:

Thank you for your E-mail message to Allan Horowitz concerning two letters
dated
September 23 and styled as Formal Complaints that you sent to the FAA's
Office of the
Chief Counsel.  In your E-mail message you addressed some issues related
to your
letter concerning FAA Inspector Zeigler and Jan's Helicopter Service and
our response
to you dated November 22.  In addition, you asked what our office intended
to do in
response to your other letter, which involved Americopters.

In our November 22 letter to you, we included references to Mr.
Wellington's March 7
E-mail message, not to question to whom it was addressed, but to point out
that
Mr. Wellington's message in no way gave approval to the operations Jan's
was
conducting.  Rather, his message addresses only two possible scenarios
without indicating
in any manner that one of them applied specifically to Jan's operations.
Moreover, we
noted that Mr. Wellington concluded by stating:  "In either case, we could
not act on the
request until the Federal Aviation Administration had reviewed the operator
and given
us written clearance, and that could prove to be a time-consuming process,
. . . ."
Mr. Wellingon's only conclusion respecting the first scenario (the one on
which you
appear to rely to support the propriety of Jan's operations) is:  "So, from
a timing/ease
of operations point of view, scenario #1 would present far fewer problems."
This
conclusion did not purport to authorize any operations Jan's was
conducting.

You may want to discuss your issues with the Guam International Airport
Authority.
In our opinion, Mr. Zeigler's E-mail message did not order it or its
officials to do
anything.

As to your letter involving Americopters, we are currently evaluating
whether the letter

satisfies the docketing requirements in 14 C.F.R. 13.5.    You raised some complex issues
that must be resolved through discussions with the agency's Flight Standards Service.
We hope to have a response to you next week.

Ed Averman

# EXHIBIT

# "J"

1    possessions, a foreign registered aircraft, such as

2    this one, requires economic authority from the

3    Department of Transportation.  And Jan's Helicopters

4    did not seek and/or obtain that authority, and

5    therefore the statement of the inspector to that effect

6    was that the aircraft could not operate legally in the

7    United States was the correct position.  And that Jan's

8    Helicopters remedy is simply to seek that authority

9    from the Department of Transportation, which is of

10   course separate and apart from the Federal Aviation

11   Administration.

12          THE COURT:  Yeah.  But what you're saying to

13   them, oh, in our opinion, by the way, is that this is

14   not the final word on this thing.  We're just telling

15   you, go to another agency, but our opinion is not a

16   final ruling on this, but you still can't land and use

17   the facilities, that's the other half of the equation.

18          MR. CAPLAN:  I don't believe that the

19   statement from the inspector to that effect, and I

20   think that was one ruse to the Airport Authority was --

21   constituted a final action on the part of the agency.

22   That was the inspector's opinion, and we would agree,

23   at least from what I understand the nature of the

24   operation that that was probably the correct opinion,

25   because it was a commercial operation and required

1    authority from the Department of Transportation, and it
2    wasn't fair, and therefore, Jan's Helicopters could not
3    operate legally under those circumstances. And that --
4    but it wasn't a final agency decision, it wasn't an
5    order that the agency itself considered to be final.

6            In fact, I believe it was the September letter
7    from Mr. Balton, who is the regional counsel for the
8    FAA for the Western Pacific Region, that made it very
9    clear to Mr. Ledger that in neither of these cases were
10   the actions of these inspectors to be considered to be
11   final actions of the agency, because those inspectors
12   weren't authorized to make those kinds of decisions,
13   and that only he as the regional counsel or certain
14   other individuals chosen or delegated could do so, and
15   therefore, these were not decisions that were in effect
16   binding on the plaintiffs in these cases.

17           THE COURT: Well, let me ask you something
18   here, Mr. Caplan. Let's suppose that this outfit had
19   chosen to violate Balton's letter and whatever other
20   direction that they were given that's not a final order
21   by the FAA, okay, let's suppose that they said, well,
22   forget this, we'll still land anyway; what would happen
23   to them?

24           MR. CAPLAN: If they chose to violate?

25           THE COURT: Yes.

1   MR. CAPLAN: Then they would act at their

2   peril, certainly, because the government, the FAA could

3   certainly take appropriate action to seek either

4   compliance through perhaps a cease and desist order, or

5   perhaps seek an enforcement action to take punitive

6   actions through either certificate action or civil

7   penalty. They would act at their peril certainly.

8       THE COURT: Well, that's the problem. You

9   have just said what is the problem here, they act at

10  their peril, meaning that there are sanctions that can

11  be imposed, court orders that can be imposed, possibly

12  even contempt.

13      MR. CAPLAN: Yes, sir.

14      THE COURT: You're saying on the one hand

15  that this is not a final action, you're saying you

16  can't land, but on the other hand, you know, this is

17  not a final order. Yet, if you violate this order I

18  will smack your fingers and crush them. You know, how

19  can you have it both ways? I have a great deal of

20  difficulty with you talking out of both sides of your

21  mouth in this kind of argument.

22      MR. CAPLAN: Your Honor, we don't believe

23  we're doing so. We believe that in this case and under

24  any statute or federal regulations, the persons that

25  are subjected to it have an obligation to obey those

1   regulations, those statutes, <u>and act at their peril</u>

2   <u>when they fail to do so.</u>  And that it doesn't require

3   the agency to take affirmative action to seek

4   prosecution, because that's part of the prosecutorial

5   discretion here as to whether to act or not to act.

6          THE COURT:  Well, you're side-stepping the

7   issue here.  The issue is that that action, regardless

8   of whether you call it a final act, a final order or

9   whatever, that action has consequences when it's

10  violated, okay.  But yet, you have issued that order

11  without giving the required requisite hearing that's

12  required under the statute.  That's the issue here.

13  You know, it's not -- prosecutorial discretion has

14  nothing to do with it.

15         The issue here is whether this court has

16  jurisdiction over this case, whether this ruling, or

17  this letter or whatever, however you choose to

18  characterize it, final response or whatever, is an

19  order that should be appealed to the Ninth Circuit,

20  whether this court has jurisdiction over that.  That's

21  the nub of the issue here.  And it seems to me that you

22  are saying, well, this is not a final order, on the one

23  hand, but the District Court can't touch it because the

24  Court of Appeals is the one with jurisdiction.  See

25  where I'm heading here?

1       MR. CAPLAN:  I think I understand, Your Honor.

2    And I, with all due respect to the court, I don't think

3    I agree with that, Your Honor.

4       THE COURT:  Well, you don't have to agree with

5    me, it's just that it seems to me the logic of it is

6    very compelling.  And I'm not angry at you, I'm just

7    kind of excited, because I'm following this logic, and

8    it's leading me to a bureaucratic snag.

9       Where are these people going to go?  We're

10   halfway around the world; where are these people going

11   to go for direction?  They've got to go to the local

12   FAA person, FAA person shows them this order that has

13   punitive sanctions, even criminal sanctions possibly

14   based on what you have said, yet you maintain that that

15   is not a final order appealable to the Ninth Circuit.

16   What's the logic here?

17      MR. CAPLAN:  Well, I understand what you're

18   saying, Your Honor, but I believe that the answer is

19   that there are times when that is -- in effect the

20   result is that the government is not required to take

21   affirmative action in these cases to resolve an issue.

22   That the, in effect, the litigants here, the plaintiffs

23   have been placed on notice by the federal government

24   that if they engage in this action, it may, the opinion

25   of at least knowledgeable officials, be inconsistent

1  with the regulations and the statute, and that they act

2  at their peril.

3          I don't think I can go much beyond that, sir.

4  I understand what you're saying, though, that it places

5  these activities in limbo, that they run the risk of

6  being prosecuted perhaps, of having a cease and desist

7  order taken against them.  But, of course, if that

8  happens, Your Honor, they will then have the

9  opportunity to litigate the agency's position, and to

10  argue that what they did was appropriate.  It may

11  affect their ability to take action in the meantime.

12  They may take the risk but --

13          THE COURT:  Yeah.  Well, the main thing here

14  is that it seems, we're looking at fairness here too,

15  and that is, that for a governmental agency to have so

16  much power and yet to be trying to, on the one hand to

17  try to say, well, it's not really a final decision; on

18  the other hand saying, well, you can't take us to the

19  court in that jurisdiction, you've got to go to the

20  Ninth Circuit.  You know, we're out in the Western

21  Pacific in the middle of nowhere.

22          And that's the other thing troubling me, is

23  that for a governmental agency to be fence sitting,

24  if I may use that term, fence sitting and then choosing

25  the route, tactically choosing the route, when it's

## DECLARATION OF SERVICE

I, David Ledger, hereby declare under penalty of perjury of the laws of the United States, that on April 17, 2007, I will cause to be served, via hand delivery, a true and correct copy of PLAINTIFF'S MEMORANDUM IN OPPOSITION TO DEFENDANT'S AMENDED MOTION TO DISMISS FOR FAILURE TO STATE A CLAIM OR, IN THE ALTERNATIVE, TO TRANSFER; DECLARATION OF DAVID LEDGER; EXHIBITS A-J: DECLARATION OF SERVICE upon the following Counsels of record:

> Mikel W. Schwab
> Assistant U.S. Attorney
> OFFICE OF THE UNITED STATES ATTORNEY
> DISTRICT OF GUAM AND CNMI
> Suite 500, Sirena Plaza
> 108 Hernan Cortez Avenue
> Hagåtña, Guam USA 96910
> Attorneys for Plaintiff United States of America

Executed this 17th day of April 2007at Hagåtña, Guam.

DAVID LEDGER